UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
VIVIAN A. DANIELS,                          :
                                            :
                    Plaintiff,              :
                                            :
            -against-                       :          **OPINION AND ORDER**
                                            :          11-cv-4498 (DLI)
MICHAEL J. ASTRUE, Commissioner of          :
Social Security,                            :
                                            :
                    Defendant.              :
------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Vivian A. Daniels ("Plaintiff") filed an application for disability insurance

benefits under the Social Security Act (the "Act") on March 3, 1998, alleging a disability that

began on November 10, 1997.  (R. 161-63.)[1]  Plaintiff received a favorable decision from the

Commissioner, awarding benefits from September 1, 1998.  (R. 33.)  Thereafter, in connection

with a continuing disability review, Plaintiff was found no longer disabled as of October 1, 2000.

(R. 34-35, 61-68.)  Plaintiff filed the instant appeal seeking judicial review of the denial of

benefits pursuant to 42 U.S.C. § 405(g).  The Commissioner now moves for judgment on the

pleadings, pursuant to Fed. R. Civ. P. 12(c), seeking affirmance of the denial of benefits.  (*See*

Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem."), Docket Entry No.

17.)  Plaintiff cross-moves for judgment on the pleadings, requesting that this Court reverse the

Commissioner's decision.  (*See* Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl.

Mem."), Docket Entry No. 18.)

---

[1] "R." citations correspond to numbered pages in the certified administrative record.  (Docket
Entry No. 21.)

For the reasons set forth below, the Commissioner's motion is denied, Plaintiff's cross-motion is granted, and the matter is remanded for further administrative proceedings consistent with this opinion.

**BACKGROUND**

A.    **Procedural History**

Plaintiff filed an application for disability insurance benefits on March 3, 1998, alleging an inability to work beginning on November 10, 1997 due to a back impairment.  (R. 161-63.) The application was denied on initial review, and then granted upon reconsideration, with an onset date of September 1, 1998.   (R. 31-33, 57-59.)    Thereafter, the Social Security Administration conducted a continuing disability review and determined that Plaintiff's disability ceased as of October 1, 2000 due to medical improvements related to her ability to work.  (R. 34-35, 61-68.)

On May 1, 2002, a reconsideration hearing was held before Disability Hearing Officer C. Tonini, who found that Plaintiff's condition had medically improved, and that Plaintiff's disability ceased as of October 1, 2000.  (R. 37, 71-83.)  Plaintiff then requested a hearing before an Administrative Law Judge, and, on May 21, 2004, Administrative Law Judge Seymour Fier ("ALJ Fier") found that Plaintiff's medical condition had improved such that Plaintiff retained the capacity to perform light work.  (R. 39-54.)  On February 28, 2006, the Appeals Council vacated ALJ Fier's decision, finding, *inter alia*, that ALJ Fier's decision did not include any rationale as to how there had been medical improvement of Plaintiff's impairments.  (R. 96-98.)

On April 23, 2007, after holding a supplemental hearing, ALJ Fier issued an unfavorable decision, once again finding that Plaintiff experienced medical improvement and was no longer disabled as of October 1, 2000.  (R. 116-26.)  By order dated December 21, 2007, the Appeals

Council again vacated and remanded the case for further administrative proceedings, noting, *inter alia*, that ALJ Fier relied on opinions from Dr. Mohammed Khattak, a physician who was removed from the New York State Agency panel of physicians eligible to perform consultative examinations in Social Security cases due to concerns about the quality of his reports.  (R. 136-40, 420.)

On June 17, 2008, ALJ Hazel C. Strauss ("ALJ Strauss," or, the "ALJ") conducted a supplemental hearing, and on May 29, 2009, found that there was medical improvement such that Plaintiff was no longer disabled as of October 1, 2000.  (R. 17-26.)  ALJ Strauss's decision became the final decision on July 13, 2011, when the Appeals Council denied Plaintiff's request for review.  (R. 6-9.)

**B.      Testimonial and Non-Medical Evidence**

Plaintiff was born in 1949 and is a high school graduate.  (R. 161, 181.)  In 1969, Plaintiff began working as an office aide at Goldwater Memorial Hospital.  (R. 181, 199, 402.)  Plaintiff's job duties included filing, messenger service, general clerical work, and answering phones.  (R. 181, 200.)  In a typical workday, Plaintiff walked for three hours, stood for three to four hours, and sat for three hours.  (R. 183, 196.)  The position also required frequent bending and reaching, with frequent lifting of up to 25 pounds.  (*Id.*)

On May 2, 1996, Plaintiff injured her back at work when a filing cabinet fell on her and caused her to fall and strike her back against a desk.  (R. 178, 189, 372.)  Approximately two months later, on July 8, 1996, Plaintiff returned to work.  (R. 178.)  However, in August 1996, Plaintiff injured her back again when she attempted to post an item on a bulletin board.  (R. 204.)  Plaintiff held the office aide position for nearly thirty years; her last date of work was November 10, 1997.  (R. 166, 178.)

In Plaintiff's 1998 disability questionnaire, Plaintiff stated that she had constant pain in her lower back that radiated into her right leg. (R. 190-91.) Plaintiff also indicated that she regularly sought treatment from Dr. Dean Chasky, an internist, took Methocarbamol and Tylenol with codeine, which caused her drowsiness and memory loss, and went to physical therapy twice a week. (R. 188, 191, 197.) Plaintiff noted that she could not complete all of her house work, but she was able to shop for food, sometimes with assistance from others. (R. 188, 197.)

At the May 1, 2002 reconsideration hearing, Plaintiff stated that she began having "drop attacks" in 2000, which caused her to fall down while walking. (R. 76-77.) Plaintiff was also treated for breast cancer in August 2001 and underwent a lumpectomy, radiation treatment, and took Tamoxifen, which made her nauseous and drowsy. (R. 76.) Plaintiff stated that she suffered from back pain that traveled down her right leg to her knee, as well as pain in her neck extending down to her arms, and a numbness and tingling in her hands. (R. 76-77.) Plaintiff also indicated that she could not lift more than ten pounds, or walk, sit, or stand too much. (*Id.*) Plaintiff stated she did not do much cooking or cleaning, but that friends and relatives helped her with chores. (*Id.*) Plaintiff noted that she did do laundry once a month, and shopped each day for a few grocery items at a store across the street from her home. (*Id.*)

At the February 25, 2004 hearing before ALJ Fier, Plaintiff appeared without counsel and testified. (R. 643-62.) Plaintiff stated that she was able to care for her personal needs, but that her niece comes over to help her dress herself every so often, and that a friend takes her shopping and other places. (R. 653.) On February 6, 2007, Plaintiff appeared with counsel for a supplemental hearing, where she testified that her condition had changed "a little" since 1998, but that there were still many things she could not do, such as clean her floors or cook on a regular basis. (R. 680.) Plaintiff stated that, in the year 2000, she could not sit or stand for very

4

long because her back would start hurting.  (*Id.*)  She also indicated that she was receiving physical therapy in 2000 for about a month, but did not get additional therapy because she was unaware that she was eligible for more.  (R. 681.)

## C.   Medical Evidence

### 1.   Medical Evidence Prior to the October 1, 2000 Cessation Date

On May 7, 1996, Plaintiff began seeing Dr. Dean Chasky, an internist, to treat back pain. (R. 269-70, 272, 274.)  Dr. Chasky's notes from May 1996 and June 1996 indicate that that a file cabinet had fallen on Plaintiff at work, which caused Plaintiff to have lower back pain.  (*Id.*)  Dr. Chasky's examination revealed right paralumbar spasm and difficulty standing.  (R. 269.)  On July 7, 1996, Dr. Chasky indicated that Plaintiff still had lower back pain and was status post crush injury of the right hand.  (R. 275-76.)  On August 26, 1996, Plaintiff told Dr. Chasky that she experienced a second work-related injury while attempting to post an item on a bulletin board.  (R. 276.)  On October 15, 1996, Dr. Chasky's notes indicate that Plaintiff was unable to sleep, sit, or stand due to discomfort and pain.  (R. 279.)  Plaintiff continued to see Dr. Chasky regularly throughout 1996.  (R. 279-80, 283.)

Dr. Chasky referred Plaintiff to Dr. Authur Gray, an orthopedist, who examined Plaintiff on February 24, 1997.  (R. 296.)  Dr. Gray noted that, although Plaintiff's gait was normal, Plaintiff moved on and off the examination table with some care.  (*Id.*)  Additionally, Dr. Gray noted that Plaintiff's straight-leg raising was approximately 60 degrees bilaterally, with low back pain beyond that point.  (*Id.*)  Dr. Gray noted that x-rays of Plaintiff's lumbrosacal spine were taken and appeared unremarkable.  (*Id.*)  Dr. Gray prescribed physical therapy for Plaintiff's lower back.  (*Id.*)

On October 30, 1997, Plaintiff returned to Dr. Chasky, whose notes from that day state that Plaintiff was unable to perform job-related duties and would be out of work for three to five months on disability. (R. 283.) The following month, on November 17, 1997, Dr. Chasky noted once again that Plaintiff needed to stay out of work, as she was unable to flex her torso or perform straight-leg raising tests. (*Id.*)

On November 10, 1997, Neville Flowers, a physical therapist, reported that Plaintiff continued to complain of pain in the lumber spine, including tenderness to palpation over L4. (R. 348.) Flowers indicated that backward and right-side bending was painful, left-side bending was pain free, and forward bending was restricted and painful. (*Id.*) Flowers also noted that Plaintiff would be treated three to four times a week. (*Id.*) On December 29, 2007, Flowers provided a follow-up report, indicating that Plaintiff's condition was unchanged. (R. 349.)

On January 6, 1998, an MRI of Plaintiff's lumbar spine was taken, which revealed mild bulging of the annulus fibrosis at the L5-S1 level causing impingement upon the ventral surface of the thecal sac. (R. 423.) The MRI report stated that there was no neural foraminal stenosis and the conus medullaris appeared normal. (*Id.*)

On January 9, 1998, Dr. Asha Haldea, a neurologist, examined Plaintiff. (R. 292, 352.) Dr. Haldea's notes indicate that Plaintiff suffered from lower back pain that radiated to the right buttocks and thigh and could only sit for 30 minutes at a time. (*Id.*) Additionally, Dr. Haldea indicated that straight-leg raising was positive on the right at 85 degrees, deep tendon reflexes were diminished, and there was tenderness at L5-S1 and T5-T6. (*Id.*) Dr. Haldea diagnosed right L5-S1 radicular pain, ordered x-rays, and referred Plaintiff to a back exercise class. (*Id.*)

Dr. Chasky's notes from January 9, 1998 indicate that Plaintiff felt better, but still had radicular pain. (R. 291.) Dr. Chasky also noted that Plaintiff's MRI was positive for "herniated

(bulging) disc." (*Id.*)    His notes from February 4, 1998 and February 25, 1998, however, indicate that physical therapy did not seem to help much in alleviating Plaintiff's lower back pain, as Plaintiff was still unable to sit for long periods of time and needed continued pain management.  (R. 291, 300.)

On March 6, 1998, Plaintiff had a follow up visit with Dr. Haldea, whose notes indicate that Plaintiff could not sit for more than 45 minutes or walk for more than 15 minutes, but that physical therapy was providing some relief.  (R. 299.)   Dr. Haldea diagnosed L5-S1 radiculopathy and recommended that Plaintiff continue her exercise class, follow her back care exercise sheet, and reduce her weight. (*Id.*) Dr. Haldea also prescribed Neurontin. (*Id.*)

On April 16, 1998, Dr. Anthony Buonocore, a state agency reviewing physician, reviewed the medical evidence. (R. 356-63.) Dr. Buonocore assessed that Plaintiff could lift up to 50 pounds occasionally and 25 pounds frequently, stand and/or walk about six hours and sit about six hours in an eight-hour workday.  He also found that Plaintiff could push or pull without limitation and occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 357-58.)

On September 25, 1998, Dr. Chasky completed a report on Plaintiff's condition, diagnosing chronic low back derangement and bulging annulus fibrosis at L5-S1.  (R. 365-71.) The report indicated that Plaintiff had low back pain radiating into the left leg, but had minimal relief from physical therapy and medications, which included Neurontin, Tylenol with codeine, and Flexeril. (R. 365-66.)  Dr. Chasky also noted that straight-leg raising was positive on the right at 80 degrees and deep tendon reflexes were 2+. (R. 366.)  Additionally, Plaintiff had an abnormal gait and used a cane. (R. 367.)  Dr. Chasky opined that Plaintiff was limited in her ability to lift and carry, could stand and walk less than 15 minutes at a time, and could sit for less than 45 minutes at a time. (R. 367-68.)

On October 8, 1998, Plaintiff was consultatively examined by Dr. Roger Antione. (R. 372-73.) Dr. Antione noted that Plaintiff walked independently, but with a severe limp when not using a cane. (R. 372.) Dr. Antione described the cane as "actual full support" and weight bearing, and required for reassurance and on all types of terrain. (R. 205.) Plaintiff could barely stand up and walk on her toes, and she could only ambulate a few feet without a cane. (R. 205, 372.) Dr. Antione diagnosed status-post contusion of the lumbosacral spine, status-post sprain of the lumbosacral spine, and bilateral lumbar radiculopathy. (R. 373.) He opined that Plaintiff would have difficulty performing activities requiring sitting and standing for prolonged periods, walking long distances, climbing and going down stairs, bending, and doing heavy lifting. (*Id.*) Dr. Antione described Plaintiff's prognosis as "[g]uarded, pending further treatment and physical therapy." (*Id.*)

An October 9, 1998 report on an x-ray of Plaintiff's lumbosacral spine noted that the height of the vertebral bodies and intervertebral disc spaces were relatively well maintained. (R. 374.) It also noted that there were small anterior osteophytes at L4-L5, and that there may be mild vascular calcifications. (*Id.*)

On December 2, 1998, Dr. Mahjelin Malik, a state agency review physician, examined the medical evidence and completed a residual functional capacity assessment. (R. 375) He opined that Plaintiff could lift and carry less than ten pounds frequently, stand and/or walk less than two hours per day in an eight-hour work day due to her cane, and sit six hours per day in an eight-hour workday. (R. 376.) Dr. Malik also noted that Plaintiff needed a cane on all types of terrain for full support, weight bearing, and reassurance. (R. 376, 382.) Dr. Malik also found that Plaintiff was limited in pushing and pulling foot controls. (R. 376.) Finally, Dr. Malik

8

opined that Plaintiff could never balance or climb ramps, stairs, ladders, ropes, or scaffolds, but could occasionally stoop, kneel, crouch, and crawl.  (R. 377.)

An August 8, 2000 report on an x-ray of Plaintiff's lumbosacral spine noted that the height of the vertebral bodies and the intervertebral disc spaces were relatively well maintained. (R. 385.)

### 2.   Medical Evidence After October 1, 2000 (Cessation Date)[2]

#### i.   Follow up with Dr. Chasky and Treatment for Drop Attacks

Plaintiff continued to visit Dr. Chasky after the cessation date.  On February 8, 2001, Dr. Chasky's notes indicate that Plaintiff reported falling and had weakness in both legs.  (R. 304.) The notes also indicate that Plaintiff continued to use a cane to ambulate and had trouble sitting due to pain.  (*Id.*)  Dr. Chasky prescribed Darvocet for pain and referred Plaintiff to a neurologist.  (*Id.*)

The following month, on March 7, 2001, Dr. Hahn, a neurologist, indicated that Plaintiff occasionally had "falls" and "drop attacks," having fallen four to five times in the past year.  (R. 305.)  On examination, straight-leg raising was positive at 70 degrees and station and gait were normal.  (*Id.*)  Dr. Hahn ordered a carotid Doppler test.  (*Id.*)  Later that month, on March 21, 2001, Dr. Chasky's notes indicate that Plaintiff had right-sided neck pain, limited range of motion in her right arm, and decreased raising ability.  (R. 306.)  Additionally, in April 2001, Plaintiff completed a medical intake form at the St. Charles Rehab Network, where she indicated that she suffered from neck pain and used a cane.  (R. 426.)

---

[2]  The administrative record includes records related to Plaintiff's breast cancer treatment and cardiovascular testing.  The Court declines to summarize all of those records, however, given that Plaintiff does not claim that she suffers from restrictions due to breast cancer or cardiac impairment, and the records would not affect the outcome of the instant motions.

On December 12, 2001, Dr. Hahn's notes indicate that Plaintiff had fallen down three or four times in the past six months, but that the Doppler test had shown normal carotid activity without plaque.  (R. 328.)  Dr. Hahn further noted that Plaintiff had a normal gait, but had pain to percussion in the lumbosacral spine, with straight-leg raising positive at 60 degrees in the supine position and 90 degrees in the seated position.  (*Id.*)  On December 13, 2001, an MRI was taken of Plaintiff's cervical spine, which revealed a straightening of the cervical lordosis, small sclerotic focus at the postero-superior margin of T1 of questionable clinical significance, and anterior bulging and osteophyte formation at C5-C7 without significant posterior contour abnormality.  (R. 396-97.)

On April 15, 2002, Dr. Hahn reported that Plaintiff had not fallen down in the last two months.  (R. 431.)  Dr. Hahn referred Plaintiff to a vascular surgeon.  (R. 431.)  Thereafter, Plaintiff visited Dr. R. Guinto, a vascular surgeon, on May 16, 2002 and July 25, 2002 for treatment for her drop attacks.  (R. 436, 443.)  The examination revealed no localizing signs or symptoms; however, Dr. Guinto ordered tests to rule out vertebral vascular insufficiency.  (*Id.*)

On July 31, 2002, Dr. Chasky filled out a report concerning Plaintiff's condition, in which he diagnosed lower back syndrome with radiculopathy and L5-S1 herniated disc, and described Plaintiff's symptoms as chronic low back pain with right lower extremity pain and right inguinal pain.  (R. 407.)  Dr. Chasky noted that he had prescribed a TENS unit, Tylenol #4, and muscle relaxants, but that the medications caused upset stomach.  (R. 408-09.)  Dr. Chasky concluded that:  (1) Plaintiff could sit continuously for one hour at a time, for up to eight hours a day, but could not stand continuously without movement for any amount of time; (2) Plaintiff could occasionally lift up to five pounds, frequently lift up to ten pounds, and occasionally carry up to 20 pounds; and (3) Plaintiff could occasionally bend and reach, but never squat, crawl, or

10

climb. (R. 408-10.) Dr. Chasky also noted that Plaintiff could not drive and would have difficulty getting to work alone by bus or subway. (R. 411-12.)

On March 14, 2003, Dr. Chasky noted that Plaintiff had "on/off" lower back pain and sciatica, usually in the morning when Plaintiff walked too much, as well as left knee pain. (R. 415.) On November 8, 2003, Dr. Chasky noted that Plaintiff still suffered from low back pain, but was neurologically intact. (R. 471.)

The following year, on January 17, 2004, Dr. Chasky noted that Plaintiff suffered from neck pain radiating to her back, but that Plaintiff's condition had improved. (R. 416.) Dr. Chasky also prescribed Darvocet N-100 and indicated that Flexeril alleviated pain, but the combination of Flexeril and codeine made Plaintiff sick. (*Id.*) On May 25, 2004, Dr. Chasky's notes indicate that Plaintiff had fallen in the past month while on a descending escalator. (R. 476.) He also reported that Plaintiff had no problem walking on flat services, but that walking up steps caused back and knee pain. (*Id.*) Dr. Chasky ordered a brain MRI due to Plaintiff's complaints of dizziness. (R. 479-80, 565.)

Plaintiff continued to visit Dr. Chasky between 2005 and 2008. Dr. Chasky's notes from July 10, 2006 state that Plaintiff had chronic "on/off" low back pain. (R. 538.) Chasky's notes from January 23, 2007 state that Plaintiff's low back pain was chronic/severe ("9/10"), and that Plaintiff needed more Darvocet. (R. 543)

On May 27, 2008, Dr. Chasky filled out a report of disability. (R. 571-77.) The report diagnosed chronic low back pain due to a herniated disc, with an onset date of 1996, and stated that Plaintiff required Darvocet, home heat therapy, and physical therapy. (R. 571-72.) Dr. Chasky described Plaintiff's prognosis as "poor/chronic." (R. 573.) Dr. Chasky also indicated that: (1) Plaintiff was unable to stand/walk longer than 30 minutes at a time; (2) Plaintiff could

11

sit 30 minutes at a time without alternating position; (3) Plaintiff could occasionally lift and carry only up to five pounds; (4) Plaintiff could occasionally reach, but never bend, squat, or climb; and (5) Plaintiff could frequently manipulate her hands, but not push or pull arm or leg controls. (R. 572-75.)  Dr. Chasky also concluded that Plaintiff could not drive and would have difficulty working on a regular and continuous basis. (R. 576.)

> ii.      *Dr. Husain and Dr. Brovender*

On October 10, 2000, Dr. Mohammed Husain, a state agency physician and medical consultant, reviewed the medical evidence in the record and provided an assessment of Plaintiff's residual functional capacity.  Specifically, Dr. Husain concluded that Plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently, was unlimited in pushing and pulling, and had no postural limitations.  (R. 389-90.)  Dr. Husain also noted that, in an eight-hour workday, Plaintiff could stand and/or walk for six hours and sit for approximately six hours. (R. 390.)

At the June 17, 2008 hearing, Dr. Arthur Brovender, an orthopedic surgeon, testified as a medical expert.  (R. 158, 597-630.)  Dr. Brovender testified that the record contained no objective neurological findings of lack of deep tendon reflexes, muscle wasting, sensory or motor loss, atrophy, weakness, or reflex changes, the January 6, 1998 MRI did not reveal a herniated disc impinging on a nerve, and the August 7, 2000 lumbrosacal spine x-rays and December 13, 2001 cervical MRI were within normal limits.  (R. 600-01, 603-04, 611-13, 619.) Dr. Brovender opined that, as of October 1, 2000, Plaintiff was capable of lifting up to twenty pounds occasionally and ten pounds frequently.  (R. 609.)  Additionally, Dr. Brovender opined that Plaintiff was able to sit and stand for six to eight hours total, with breaks, and that Plaintiff

could bend, stoop, squat, kneel, and crouch occasionally, but could not crawl, or climb ladders, scaffolds, or ropes.  (R. 609-12.)

   *iii.*    *Vocational Expert Testimony*

  Pat Green testified as a vocational expert at the June 17, 2008 hearing.  (R. 156, 631-41.) Green stated that Plaintiff's past work as an office helper is classified as a light position.  (R. 633.)  When presented with a hypothetical claimant of Plaintiff's age, education, and vocational experience, with a residual functional capacity described by Dr. Brovender, Green testified that such an individual could perform Plaintiff's past work as an office aide.  (R. 633-35.)

## DISCUSSION

### I.   Standard of Review

  Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).  The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotations omitted).  The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

  The district court is empowered "to enter, upon the pleadings and transcript of the record,

a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

## II.     Disability Claims

To receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If at any step the ALJ finds that the

claimant is either disabled or not disabled, the inquiry ends there.  First, the claimant is not

disabled if he or she is working and performing "substantial gainful activity."  20 C.F.R. §

404.1520(b).  Second, the ALJ considers whether the claimant has a "severe impairment,"

without reference to age, education or work experience.  Impairments are "severe" when they

significantly limit a claimant's physical or mental "ability to conduct basic work activities."  20

C.F.R. § 404.1520(c).  Third, the ALJ will find the claimant disabled if his or her impairment

meets or equals an impairment listed in Appendix 1.  *See* 20 C.F.R. § 404.1520(d); 20 C.F.R. pt.

404, subpt. P, app. 1.

If the claimant does not have a listed impairment, the ALJ makes a finding about the

claimant's residual functional capacity ("RFC") in steps four and five.  20 C.F.R. § 404.1520(e).

In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant

work."  20 C.F.R. § 404.1520(e).  Finally, in the fifth step, the ALJ determines whether the

claimant could adjust to other work existing in the national economy, considering factors such as

age, education, and work experience.  If so, the claimant is not disabled.  20 C.F.R. §

404.1520(f).  At this fifth step, the burden shifts to the Commissioner to demonstrate that the

claimant could perform other work.  *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)

(citing *Carroll*, 705 F.2d at 642).

Under certain circumstances, a finding that the claimant is disabled for a finite period of

time is appropriate.  The Commissioner has promulgated regulations to assist ALJs in

determining whether a claimant's alleged disability continues or ends.  *See* 20 C.F.R. §

404.1594(f).

> First, the Commissioner determines whether the claimant is
> engaged in substantial gainful activity.  20 C.F.R. §
> 404.1594(f)(1).  If so, the Commissioner will find that the
> disability ended.  *Id*.  If not, the Commissioner's review proceeds.

Second, the Commissioner determines whether the claimant's impairment or combination of impairments meets or equals the severity of an impairment listed in Appendix 1. 20 C.F.R. § 404.1594(f)(2). If so, the claimant's disability is said to continue. *Id*. If not, the Commissioner's review proceeds.

Third, the Commissioner determines whether there has been medical improvement. 20 C.F.R. § 404.1594(f)(3). If there is no decrease in medical severity, there is no medical improvement. Upon finding medical improvement, measured by a decrease in medical severity, the Commissioner's review continues.

Fourth, the Commissioner determines whether the medical improvement found in step three is related to the claimant's ability to do work in accordance with 20 C.F.R. § 404.1594(b)(1)-(4). Medical improvement is related to the ability to work if it results in an increase in the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1594(b)(3). If medical improvement is unrelated to the claimant's ability to work, the Commissioner proceeds to step five. *Id*. If the medical improvement is related to the claimant's ability to work the Commissioner proceeds to step six. *Id*.

Fifth, the Commissioner considers whether the exceptions to medical improvement listed in 20 C.F.R. § 404.1594(d) and (e) apply to the claimant's medical improvement. 20 C.F.R. § 404.1594(f)(5). If none apply, the claimant's disability continues. *Id*.

Sixth, if medical improvement is related to the claimant's ability to do work or one of the aforementioned exceptions applies, the Commissioner will determine whether the claimant's impairments are severe. 20 C.F.R. § 404.1594(f)(6). When the evidence shows that all current impairments do not significantly limit the claimant's physical or mental abilities to perform basic work activities, the impairments are not severe and the claimant will no longer be considered disabled. *Id*.

Seventh, if the claimant's impairments are severe, the Commissioner will assess the claimant's residual functional capacity based upon all current impairments and determine whether claimant is able to perform past work. 20 C.F.R. § 404.1594(f)(7). If capable of doing past work, the claimant is no longer disabled. *Id*.

16

> Finally, if the claimant can no longer perform past work, the Commissioner must determine whether the claimant is capable of other work given her residual functional capacity assessment and her age, education, and previous work experience.  20 C.F.R. § 404.1594(f)(8).  If the claimant is capable, her disability will have ended.  *Id*.  If the claimant is incapable, her disability is found to continue.  *Id*.

*Barra v. Astrue*, 2012 WL 925005, at *9-10 (E.D.N.Y. Mar. 19, 2012) (quoting *Wilson v. Astrue*, 2010 WL 2854447, at *2-3 (W.D.N.Y. July 19, 2010)).  "Further, in a medical improvement case in which a claimant has been granted [DIB] for a closed period, the Commissioner must compare the severity of claimant's impairment at the onset of disability with the severity of claimant's impairment at the purported end-date of disability, i.e., the point at which the claimant medically improved and could return to work."  *Crowell v. Astrue*, 2011 WL 4863537, at *2 (S.D.N.Y. Oct. 12, 2011) (citing *Chavis v. Astrue*, 2010 WL 624039, at *4 (N.D.N.Y. Feb. 18, 2010)).

## III.    ALJ's Decision

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity.  (R. 20.)  At step two, the ALJ concluded that Plaintiff's impairments, in combination or individually, did not meet or equal a listed impairment.  (R. 21.)  At steps three and four, the ALJ concluded that medical improvement related to Plaintiff's ability to work occurred as of October 1, 2000.  (R. 21-25.)  Thus, under the eight-step framework, the inquiry must continue at step six. At step six, the ALJ determined that Plaintiff's lumbar impairment was severe.  (R. 25.)

Finally, at step seven, the ALJ assessed Plaintiff's residual functional capacity and determined that, "as of October 1, 2000, [Plaintiff] had the residual functional capacity to perform light work or work that involves lifting 20 pounds occasionally, 10 pounds frequently, sitting and standing 6 to 8 hours with breaks, she could bend, stoop and squat occasionally, but should not crawl, could use steps and ramps, but no ladders, scaffolds or ropes, could kneel and

crouch occasionally, and has no limitations in balancing and no environmental restrictions or other restrictions." (R. 22.) In making the assessment, the ALJ relied on the opinions of Dr. Brovender and Dr. Husain, but declined to give significant weight to the findings of Dr. Chasky. (R. 21-22.) The ALJ, therefore, determined that claimant could perform past work as an office helper. (R. 25.)

## IV.     Application

### a.      Failure to Accord Proper Weight to Medical Opinions

With respect to "the nature and severity of [a claimant's] impairment(s)," 20 C.F.R. § 404.1527(d)(2), "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d. Cir. 2003). A claimant's treating physician is one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988). A treating physician's medical opinion regarding the nature and severity of a claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). The Second Circuit has noted that "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Lazore v. Astrue*, 443 F. App'x 650, 652 (2d Cir. 2011) (quoting *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). Nonetheless, "[u]nder the applicable regulations, even 'nonexamining sources' may 'override treating sources' opinions, provided they are supported by evidence in the record.'" *Netter v.*

*Astrue*, 272 F. App'x 54, 55-56 (2d Cir. 2008) (citing *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir.1993)).

The ALJ must consider the following factors to determine how much weight to give the treating physician's opinion: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant but unspecified factors. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The ALJ is required to provide "good reasons" for the weight accorded to a treating physician's medical opinion; failure to do so is a ground for remand. *Schaal*, 134 F.3d at 503-05; *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") However, the ultimate determination that a claimant is "disabled" or "unable to work" is reserved to the Commissioner. 20 C.F.R. § 404.1527(d). "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell*, 177 F.3d at 133.

The ALJ's adherence to the treating physician rule operates in tandem with the affirmative duty to develop a full and fair record. *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 404.1512(d)-(f) (setting forth the affirmative obligations of ALJs).

### i.   *Dr. Husain and Dr. Brovender*

Plaintiff contends that the ALJ erred by giving significant weight to two non-examining physicians, Dr. Husain and Dr. Brovender, and discounting the findings of Plaintiff's treating physician, Dr. Chasky. (Pl. Mem. at 22-24.) Specifically, Plaintiff argues that the opinions of

Dr. Husain and Dr. Brovender cannot be accorded significant weight because, in opining on Plaintiff's residual functional capacity, Dr. Husain and Dr. Brovender both reviewed and relied on consultative examination records from Dr. Khattak, a physician who is no longer eligible to perform consultative examinations due to the unreliability of his prior work.  (*Id.*)  The Court agrees with Plaintiff and finds that remand is warranted on this basis.

On December 21, 2007, the Appeals Council remanded this case principally due to ALJ Fier's reliance on the opinions of Dr. Khattak.  (R. 138.)  Recognizing that Dr. Khattak was removed from the New York State Agency panel of physicians eligible to perform consultative examinations in Social Security cases, the Appeals Council specifically instructed that ALJ Strauss should, on remand, "[a]fford no weight to the evidence from Dr. Khattak."  (*Id.*) Separate correspondence included as part of the administrative record indicates that the New York State Division of Disability Determinations prohibited Dr. Khattak from performing consultative examinations due to concerns over the quality and reliability of his work:

> The New York State Division of Disability Determinations (the New York DDS or "state agency") decided to stop allowing Dr. Khattak to perform consultative examinations as a result of what it called the ongoing poor quality of Dr. Khattak's examinations and reports.  The DDS concluded that on numerous occasions, his consultative medical reports did not accurately reflect the level of severity documented in the reports from treating physicians.  Despite additional training, the DDS found that on at least two occasions in which it had other CEs repeat examinations done by Dr. Khattak, the other physicians' findings were more consistent with the treating sources' medical evidence.

(R. 420.)  And, notably, several recent decisions in this district have also raised similar concerns about the reliability of Dr. Khattak's reports.  *Talavera v. Astrue*, 2010 WL 3325408, at *3 (E.D.N.Y. Aug. 19, 2010) ("While it is unclear to what extent the ALJ relied on Dr. Khattak's findings, courts in this District have questioned the reliability of reports created by Dr. Khattak, and have remanded matters to the Commissioner when reliance on his findings appears in the

record."); *Heath v. Astrue*, 2008 WL 1850649, at *3 n.4 (E.D.N.Y. Apr. 24, 2008) ("In light of Dr. Khattak's troubled history and the Social Security Administration's own stance of according no weight to his findings, the Court itself finds little basis for crediting Dr. Khattak's opinions."); *Lamar v. Barnhart*, 373 F. Supp. 2d 169, 177 (E.D.N.Y. 2005) ("Dr. Khattak's unsupported, Panglossian diagnoses thwart the ability of legitimately disabled individuals such as Lamar to receive the much-needed compensation to which they are entitled.").

Here, Plaintiff contends that Dr. Husain's report, dated October 10, 2000, is not entitled to significant weight because Dr. Husain relied on and incorporated Dr. Khattak's previous medical findings from August 7, 2000.  Indeed, a cursory review of Dr. Husain's report strongly suggests that Dr. Husain did, in fact, consider and adopt the earlier medical findings of Dr. Khattak when opining on Plaintiff's residual functional capacity.  (*Compare* October 10, 2000 Dr. Husain Report, R. 38 (noting that "current examination" revealed that Plaintiff ambulates without assistance with a steady gait, lumbosacral spine curvature is normal, and flexion was 80 degrees and lateral 30 degrees) *with* August 7, 2000 Dr. Khattak Report, R. 383-84 (finding, upon examination, that Plaintiff ambulates without assistance with a steady gait, lumbosacral spine curvature is normal, and "[f]orward flexion 80 degrees and lateral flexion 30 degrees bilaterally").)

Similarly, as to Dr. Brovender, the transcript of the administrative hearing demonstrates that Dr. Brovender not only reviewed copies of Dr. Khattak's reports, but also attempted to rely on Dr. Khattak's reports when testifying on Plaintiff's residual functional capacity.  (R. 599-602, 606.)  One pertinent exchange reads as follows:

> ALJ:  Okay, so Dr. Brovender, did the claimant according to information you have reviewed from the file at the time she was found disabled, she was found to need a cane in order to ambulate.  Is that same circumstance necessary as of October 1, 2000?

DR. BROVENDER: I haven't, in this record there's no one who said they prescribed a cane.  I don't know who prescribed a cane.  Just as I said, that she used a cane.  And I would say that it wasn't necessary based on what I see here.

ALJ:  Okay.

DR. BROVENDER:  And in 9F [Dr. Khattak's report], they talk about her gait is straight.

PLAINTIFF'S ATTORNEY:  Again, we can't use.

ALJ:  Oh, 9F, right is one of . . .

DR. BROVENDER:  We can't use that one?

ALJ:  No.

DR. BROVENDER:  Okay.

ALJ:  We can't use 9F and we can't use, let's see, 15F.

PLAINTIFF'S ATTORNEY:  Or 18F.

(R. 605-06.)

Notably, the Commissioner does not dispute Plaintiff's assertion that Dr. Husain and Dr. Brovender reviewed and relied on Dr. Khattak's findings when opining on Plaintiff's residual functional capacity, thereby lending further credence to Plaintiff's argument.  In sum, under these circumstances, the opinions of Dr. Husain and Dr. Brovender are "not 'supported by evidence of record' as required to override the opinion of [Plaintiff's] treating physician." *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (finding remand warranted because "it is not clear that [the state agency medical consultant] reviewed all of the evidence in the record in formulating his medical opinion").

Accordingly, because the ALJ failed to properly weigh and evaluate this medical evidence, remand is appropriate.  The Commissioner remains free to engage another medical

consultant or expert as it deems appropriate; however, such individuals should not be permitted to review or otherwise consider, directly or otherwise, the opinions of Dr. Khattak, who is no longer entitled to perform consultative examinations, or Dr. Husain, who appears to have relied on Dr. Khattak's medical findings.

ii.     *Dr. Chasky's May 28, 2008 Report*

Plaintiff also contends that the ALJ erred when she assigned no weight to Dr. Chasky's May 28, 2008 report and found that it "pertain[ed] to a period subsequent to the period at issue." (Pl. Mem. at 24.)

A retrospective medical diagnosis by a treating physician is entitled to controlling weight when "no medical opinion in evidence contradict[s][a] doctor's retrospective diagnosis finding a disability." *Rivera v. Sullivan*, 923 F.2d 964, 968 (2d Cir. 1991). Nonetheless, it is not proper to "reject the treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79. Here, there is some ambiguity as to whether Dr. Chasky's May 28, 2008 report reflects a retrospective assessment of the severity of Plaintiff's condition for the relevant period of September 1, 1998 to October 1, 2000. Specifically, the heading of the report states that it covers the time period of July 31, 2002 to present; however, the ALJ did not appear to consider that another portion of the report confirms the "onset date" of medical conditions described therein as 1996, which would strongly suggest that the opinion is, in fact, retrospective. (R. 571.)

Accordingly, on remand, the ALJ should inquire whether Dr. Chasky's May 28, 2008 opinion is retrospective, and, if so, consider the evidence and accord it the proper weight. *See Pena v. Astrue*, 2011 WL 321741, at *4 (E.D.N.Y. Jan. 31, 2011) (finding remand warranted to allow ALJ to inquire whether findings were retrospective); *Martinez v. Massanari*, 242 F. Supp.

2d 372, 378 (S.D.N.Y. 2003) ("[T]hat three physicians who evaluated Martinez . . . acknowledged a continuity of back problems commencing well before the date last insured obligated the ALJ to explore the possibility that the diagnoses applied retrospectively to the insured period.").

## **CONCLUSION**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted. Accordingly, pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further administrative proceedings consistent with this opinion. Specifically, on remand, the ALJ is to thoroughly assess the findings and the weight to be accorded to Dr. Chasky, Plaintiff's treating physician, after considering all of the relevant factors and any new information and evidence received.

SO ORDERED.

Dated: Brooklyn, New York
         August 30, 2013

                                            _____
                                            */s/*
                                            DORA L. IRIZARRY
                                            United States District Judge